# EXHIBIT 1

Staff:  Tai Meah, Committee Counsel
Rachel Cordero, Legislative Counsel
Joan Povolny, Policy Analyst
Pakhi Sengupta , Finance Analyst



## THE NEW YORK CITY COUNCIL

### REPORT OF THE HUMAN SERVICES DIVISION
Robert Newman, Legislative Director

### COMMITTEE ON WOMEN'S ISSUES
Council Member Julissa Ferreras, Chair

**March 2, 2011**

| | |
|---|---|
| **PROPOSED INT. NO. 371-A:** | By Council Members Lappin, the Speaker (Council Member Quinn), Arroyo, Ferreras, Mendez, Garodnick, Reyna, Foster, Brewer, Fidler, James, Koppell, Koslowitz, Lander, Palma, Rose, Van Bramer, Rodriguez, Chin, Dickens, Dromm, Mark-Viverito and Jackson. |
| **TITLE:** | Local law to amend the administrative code of the city of New York, in relation to pregnancy services centers. |
| **ADMINISTRATIVE CODE:** | Amends chapter five of title twenty by adding subchapter 17. |

## INTRODUCTION

On Tuesday, March 1, 2011, the Committee on Women's Issues, chaired by Council Member Julissa Ferreras, conducted a hearing and committee vote on Proposed Introductory Bill

Number 371-A ("Intro. 371-A"), a bill concerning pregnancy services centers. The Committee voted in favor of Intro. 371-A by a vote of four to zero. One committee member was absent.

The Committee held a hearing on Introductory Bill Number 371 ("Intro. 371") on November 16, 2010. At that hearing, the committee heard testimony from the New York City Department of Health and Mental Hygiene ("DOHMH"), the New York City Department of Consumer Affairs ("DCA"), the New York Civil Liberties Union, NARAL, the Center for Reproductive Rights and other reproductive health care advocates, pregnancy services centers, Planned Parenthood and other health care providers, legal groups and interested parties.

## BACKGROUND

PSCs are facilities that advertise and provide pregnancy-related services to women who are or may be pregnant. PSCs are not state-licensed medical facilities, and they generally do not have a licensed medical provider on staff who provides or directly supervises the provision of all of the services at such pregnancy services center. Generally, PSCs do not formally disclose to clients whether they do or do not provide abortion or referrals for abortion; provide FDA-approved emergency contraception or referrals to organizations or individuals who provide emergency contraception; or provide prenatal care or referrals for prenatal care.

### Deceptive Practices

Nearly all of these centers offer free pregnancy testing and at least two of the PSCs in New York City offer ultrasounds on site.[1] Although many might think of these services as medical, and at least one PSC advertises its pregnancy tests as being "medical quality,"[2] in fact, the pregnancy tests offered at PSCs generally are self-administered and are available over-the-

---

[1] NARAL Pro-Choice N.Y. Found. & Nat'l Inst. for Reproductive Health, *She Said Abortion Could Cause Breast Cancer: A Report on the Lies, Manipulations, and Privacy Violations of Crisis Pregnancy Centers* (2010), *available at* http://www.prochoiceny.org/assets/files/cpcreport2010.pdf .
[2] *Id.*

counter at a pharmacy.  Providing these tests and ultrasounds helps create the impression that

PSCs are medical facilities.  However, PSCs may not make clear that they are not actually

medical facilities.  This makes it difficult for a person to know, as a former Attorney General

noted in announcing a settlement with a PSC accused of misleading advertising and

inappropriate medical counseling, that PSCs are not regulated by the government, unlike medical

providers who treat pregnant women and are subject to rigorous oversight by the State

Department of Health.[3]  During the committee hearing on Intro. 371 in November, the committee

heard testimony on how the deceptive practices of PSCs may cause women to experience delays

in receiving reproductive health care.  An abortion counselor testified:

> There have been accounts . . . from my clients about these
> misrepresentations being taken even a step further, where some
> girls are set up for procedures with appointments, only to have
> these appointments canceled and rescheduled time and time again,
> in an attempt to prolong the process past a point when a woman
> can have access to a real and safe abortion procedure by a licensed
> provider.[4]

To further the appearance that they are medical facilities, some PSCs model their

facilities after clinics or doctors' offices.[5]  One pregnant woman's recent experience at a New

York City PSC, described in the New York Daily News, is instructive:

> I was brought to a bathroom and told to pee for a pregnancy
> test. It was "inconclusive." The only way to be sure was a
> sonogram. Betty led me into an exam room, where a woman in
> scrubs told me to lie down. This center does not appear to employ
> any medical staff, but the room looked exactly like a doctor's
> office. The woman in scrubs pulled the wand over my belly and
> played the sound of the heartbeat for me.
> With a few more swipes over my belly, the woman in

---

[3] Press Release, N.Y. State Att'y Gen'l Eliot Spitzer, *Spitzer Reaches Agreement with Upstate Crisis Pregnancy Center* (Feb, 28, 2002).

[4] N.Y.C. Council Hearing, November 16, 2010, *Introduction. No. 371*: testimony of Center for Reproductive Rights at 75-76.

[5] Jennifer Carnig, *Abortion Foes Resort to Deception: What I Found When I Went to a Crisis Pregnancy Center*, The New York Daily News, Nov. 5, 2010; Nat'l Abortion Federation, *Crisis Pregnancy Centers: An Affront to Choice* 4 (2006).

> scrubs "gave the baby a full examination" and declared, "your baby
> is healthy and perfect." The procedure took less than five minutes.
> I was never seen by a doctor or nurse, and my fetus had not
> received a "full examination," though if I didn't know beforehand, I
> would have assumed - as many women do - that I'd had a full
> checkup.[6]

In addition to the services they provide and the design of their facilities, PSCs often choose to

locate in close proximity to a hospital or a reproductive health clinic that does have a licensed

medical provider on staff who is responsible for all services offered at that facility.[7]    This

includes PSCs in New York City that are across the street, in the same building as or walking

distance from Planned Parenthood clinics, as well as a PSC mobile facility outside a reproductive

healthcare clinic in the Bronx.  PSCs are also located in buildings with signage displaying terms

such as "All Med" with other licensed medical providers."  At the hearing, a social worker for

Planned Parenthood testified to how the location of a PSC and aggressive tactics of PSC staff

misled her client:

> Last week, I met with a 32-year-old mother with two young
> children. She'd recently cut back on her work hours because her 3-
> year-old has autism and needs special services and care. After a
> missed period, she was concerned that she might be pregnant. This
> woman mistook the [PSC] across the street for the Planned
> Parenthood health center. . . .  After providing a urine sample, she
> was told she would have to watch graphic videos of abortion prior
> to obtaining her test results. . . . Although this patient ultimately
> accessed medical care, it was only after the CPC staff had deceived
> and emotionally traumatized her.[8]

PSCs also may confuse potential clients through naming and marketing techniques. A

1998 report by the Family Research Council investigated effective names for PSCs and found

that "Women's Resource Center" was considered the most valuable in reaching women who

---

[6] *Id.*

[7] Ariel Kaminer, A Hidden Minefield at Pregnancy Centers, N.Y. Times, Oct. 29, 2010; EMC Frontline Pregnancy Ctrs., *About EMC*, http://emcfrontline.org/page.php?id=1 (last visited Nov, 14, 2010); NARAL Pro-Choice N.Y. Found., *supra* note 1 at 7-8.

[8] N.Y.C. Council Hearing, November 16, 2010, *Introduction. No. 371*: testimony of Planned Parenthood at 9.

4

were "'at risk for abortion.'"[9] Many of the PSCs in New York City have names that, like

Women's Resource Center, do not provide a prospective client with information about the range

of services that are or are not available at the PSC. For example, some of New York City's PSCs

call themselves Expectant Mother Care, Crisis Pregnancy Center and Pregnancy Resource

Services.[10]  A pregnant New York Times reporter who visited a PSC located in the same

building as an abortion provider reflected that "[i]t's easy to imagine someone spotting the

generic-sounding Expectant Mother Care in the lobby directory and assuming it was a general

source for reproductive information, perhaps even a medical office."[11]

The delay in reproductive healthcare caused by the misleading tactics of PSCs was

evidenced by numerous witness accounts at the committee hearing in November. A licensed

medical provider who works in a reproductive healthcare facility in the Bronx testified about a

PSC mobile facility that locates in front of her facility:

> I can testify [that] on many occasions the ultrasounds that these
> patients are given [by the mobile PSC] are misdiagnosed. There is
> no doctor on the bus giving these patients an accurate diagnosis.
> The patients do come into my clinic after they've had their [PSC]
> ultrasounds. I have many cases where I have reported that the
> patients have had fetal anomalies and the ultrasounds [were]
> inconclusive.[12]

A Reverend who often counsels pregnant women testified about one of his parishioners who

personally experienced a delay in obtaining desired medical services:

> Sophia was angry. She worked at a grocery store and had to
> negotiate with both her boss and one of her co-workers to get the
> day off so she could go to the clinic and have the abortion that she
> and her husband had together decided was best. When she realized

---

[9] Curtis J. Young, Family Research Council, *Turning Hearts toward Life: Market Research for Crisis Pregnancy Centers* 9 (1998).

[10] Lifecall Resources for Pregnant Women & their Babies, *Crisis Pregnancy Centers: New York*, http://www.lifecall.org/cpc.html (last visited February 27, 2011).

[11] Ariel Kaminer, *supra* note 7.

[12] N.Y.C. Council Hearing, November 16, 2010, *Introduction. No. 371*: testimony of Dr. Emily's at 194.

>she had gone to a place that wasn't going to provide the service she
>needed, that she had wasted her day off, lost the income she could
>have had that day working, and that it would be without purpose,
>and that it might be three weeks before she could get another day
>off to try this again, she was outraged.[13]

A reproductive counselor offered testimony about deliberate attempts to delay proper medical

care:

>There have been accounts that I have heard from my clients about
>these misrepresentations being taken even a step further, where
>some girls are set up for procedures with appointments, only to
>have these appointments canceled and rescheduled time and time
>again, in an attempt to prolong the process past a point when a
>woman can have access to a real and safe abortion procedure by a
>licensed provider.

The harm in preventing or delaying a woman's reproductive healthcare was outlined in

DOHMH's testimony at the committee's hearing.  Dr. Susan Blank of DOHMH testified about

the importance of receiving early prenatal care from a licensed medical provider:

>Delays in prenatal care decrease the likelihood of a healthy
>pregnancy, delivery, healthy newborn and mother. That's why
>starting prenatal care in the first trimester is [the] standard of care
>in obstetric practice. Early prenatal care is important because
>number one, it identifies underlying health problems that could
>impact the pregnancy, such as diabetes, high blood pressure, lupus,
>and heart disease.  Number two, it allows for changes that need to
>be made in existing medical regimes so that prescriptions can be
>changed and mothers are not taking teratogenic medications.
>Third, it is an opportunity to receive preliminary testing for
>genetic disorders that could affect the fetus, such as sickle cell
>anemia or cystic fibrosis. Fourth, it's an opportunity for counseling
>expectant mothers regarding health promoting behaviors, whether
>that's smoking cessation, alcohol cessation or importantly, folic
>acid supplementation in order to prevent neural tube defects. . . .
>It's important to get early care, so that . . . a pregnant woman could

---

[13] N.Y.C. Council Hearing, November 16, 2010, *Introduction. No. 371*: testimony of All Souls Bethlehem Church at
222.

6

maximize her chances of a healthy pregnancy and a healthy outcome, namely a healthy newborn.[14]

DOHMH also testified to the harmful results of delaying an abortion:

...a late term abortion is more complicated and more costly to perform. It's riskier for the mother in terms of potential complications. So a decision to go ahead with a termination should happen earlier rather than later. The later term abortions are technically more difficult. They tend to need to be done in an inpatient kind of a setting, will require advanced levels of care such as with an anesthesiologist and a skilled surgeon. Generally, there are fewer providers that offer those services, so access is also an issue if a decision is forestalled. There is an increased risk of some complications such as infection and uterine rupture.[15]

Lastly, DOHMH testified to the harm in preventing or delaying a woman's access to emergency contraception:

Emergency contraception that is sold in the United States, the label says within 72 hours. The real bottom line here is the sooner the better. There have been additional studies that have shown efficacy up to 120 hours after unprotected sex. But again, the FDA labels say 72 hours. . . .The longer you wait, the less likely it is that you're going to have the desired effect, namely preventing an unplanned pregnancy.[16]

PSCs may similarly confuse prospective clients through advertising. For example, PSCs have been listed in the Yellow Pages under categories titled "abortion" or "medical."[17] Moreover, 37.5 percent of the websites reviewed by NARAL as possible PSC websites did not provide any indication of whether or not they provided abortion or contraception.[18]

A 1987 account of a Brooklyn woman's encounter with a PSC sounds similar to

---

[14] N.Y.C. Council Hearing, November 16, 2010, *Introduction. No. 371*: testimony of Dep't of Health and Mental Hygiene at 20-21.
[15] N.Y.C. Council Hearing, November 16, 2010, *Introduction. No. 371*: testimony of Dep't of Health and Mental Hygiene at 25-26.
[16] N.Y.C. Council Hearing, November 16, 2010, *Introduction. No. 371*: testimony of Dep't of Health and Mental Hygiene at 54-55.
[17] NARAL Pro-Choice N.Y. Found., *supra* note 1.
[18] *Id.*

7

testimony presented at the November 2010 hearing. The woman saw an ad in the Yellow Pages that asked if she was "thinking of an abortion."[19]  Since this woman was contemplating abortion, she went to the PSC, but the PSC did not perform abortions or provide referrals for abortions. According to this woman,

> I was looking for a referral to an abortion clinic, and nothing in the ad or on the phone indicated to me that this wasn't just what I was looking for ....[20]

This story and others like it prompted an investigation by then New York State Attorney General Abrams who sued two PSCs in Manhattan and one in Brooklyn.[21]  Abrams argued that the three centers falsely advertised offering referrals to abortion clinics, falsely stated that they conducted pregnancy tests by medical personnel and falsely promised to provide information on birth control.[22]  A court ordered the three clinics not to advertise in the "Abortion Services" section in the Yellow Pages, to tell women that they were not medical clinics and not to state that they offered birth control unless they specified that they were only offering natural family planning.[23]

More recently, in 2002, Attorney General Spitzer investigated nine PSCs throughout the State for misleading advertising and inappropriate medical counseling.[24]  An agreement was entered with one PSC, Birthright of Victor, that required the PSC to disclose that it did not provide abortion services or make referrals for abortions.[25]  Birthright agreed to disclose verbally and in writing that it is not a licensed medical provider and to inform anyone who calls or visits

---

[19] Jane Gross, *Pregnancy Centers: Anti Abortion Role Challenged*, N.Y. Times, Jan. 23, 1987.
[20] *Id.*
[21] Jeanie Kasindorf, *Abortion in New York*, N.Y. Magazine, Sep. 18, 1989, at 37-38.
[22] *Id.*
[23] *Id.*
[24] Press Release, N.Y. State Att'y Gen'l Eliot Spitzer, *Spitzer Reaches Agreement with Upstate Crisis Pregnancy Center* (Feb, 28, 2002).
[25] *Id.*

the PSC of that fact.[26]  The agreement also requires that Birthright clarify in its advertisements that it provides self-administered, over-the-counter pregnancy tests only.[27]  Despite the attorney generals' recognition of fraudulent behavior by PSCs and several attempts to cure that behavior, many PSCs in New York City have continued some or all of their harmful practices.  One potential reason these practices continue, as evidenced at the November, 2010 hearing on Intro. 371, is that the sensitive nature of harms committed lead to a disproportionately small number of complainants.  Women who have been harmed by PSCs may not feel comfortable reporting personal incidents relating to accessing abortion, emergency contraception or prenatal care for an unplanned pregnancy.

**Lack of Confidentiality**

Licensed medical providers and licensed medical facilities are required to comply with confidentiality rules such as those contained in the federal Health Insurance Portability and Accountability Act.[28]  Certain other entities such as financial institutions[29] are subject to specific privacy and confidentiality rules, but there are no laws that apply to organizations or individuals that do not fall into one of these specific categories.  Therefore, most, if not all, PSCs are not required by any federal, New York State or New York City regulation to keep client information confidential. According to NARAL's volunteer investigators, most of the PSCs they visited asked them to fill out forms that requested various types of personal information.[30]  For example, one PSC asked for information including the person's "relationship status, work information, and even the personal information of the 'father of the baby.'"[31]  Only three of the PSCs made any

---

[26] *Id.*

[27] *Id.*

[28] Office of Civil Rights, U.S. Dep't of Health & Human Servs., *Health Information Privacy: For Covered Entities*, http://www.hhs.gov/ocr/privacy/hipaa/understanding/coveredentities/index.html (last visited Nov. 14, 2010).

[29] *E.g.*, Gramm-Leach-Bliley Act, Pub. L.106-102, 113 Stat.1338 (1999).

[30] NARAL Pro-Choice N.Y. Found., *supra* note 1.

[31] *Id.*

promises about keeping the information they collected confidential.[32]  At the November, 2010, committee hearing on Intro. 371, a social worker from Planned Parenthood testified to a patient's experience where:

> . . . a patient . . . who went to a [PSC], provided personal information, including the location where she worked and some of the [PSC] staff members came to where she worked. . . .that wasn't the only egregious thing that the staff members of this [PSC]had done. . . they had been sending her text messages, harassing text messages inquiring if she had named her baby yet.[33]

The privacy of an individual's health and personal information is a significant concern in many situations, and certainly when a woman is or thinks she may be pregnant. For example, studies demonstrate an increased risk of abuse during pregnancy for women in abusive relationships, particularly for unintended pregnancies.[34] In addition, at least one recent study determined that women in both violent and non-violent abusive relationships were often subject to attempts to control their reproductive decisions after they were pregnant.[35]

### Proposed Introduction Number 371-A ("Intro. 371-A")

Intro. 371-A would amend chapter five of title 20 of the Administrative Code of the City of New York by adding a new subchapter 17. The new subchapter would be titled "Pregnancy Services Centers." The intent of Intro. 371-A is to ensure that women visiting PSCs are fully informed about whether or not they are consulting with a licensed medical provider, and what pregnancy-related services the PSCs do or do not offer, so that women receive timely reproductive health care.

---

[32] *Id.*

[33] N.Y.C. Council Hearing, November 16, 2010, *Introduction. No. 371*: testimony of Planned Parenthood at 88-89.

[34] Ann M. Moore, *et al.*, *Male Reproductive Control of Women who Have Experienced Intimate Partner Violence in the United States*, 70 Social Sci. & Med. 1737 (2010).

[35] *Id.*

Intro 371-A would define PSCs as facilities that provide services to women who are or may be pregnant and either (1) provide obstetric ultrasounds, obstetric sonograms or prenatal care; or (2) have the appearance of a licensed medical facility. The legislation is clear that any facility licensed by the State of New York or the federal government to provide medical or pharmaceutical services, or any facility with a licensed medical provider present to provide or supervise the pregnancy related services offered (such as a group medical practice or an individual physician's practice), is not a PSC. These facilities and practices are regulated by the State, and already risk losing their licenses if they engage in deceptive practices. Licensed medical provider would be defined as a person licensed or otherwise authorized under the provisions of articles one hundred thirty-one, one hundred thirty-one-a, one hundred thirty-one-b, one hundred thirty-nine or one hundred forty of the New York Education Law, to provide medical services.

This definition is tailored to target the most egregious harms evidenced at the hearing: deceptive practices that delay or limit access to reproductive healthcare. The definition, and by extension the legislation, does not solely concern facilities that do not provide or refer for abortion. All facilities that provide pregnancy-related services without a licensed medical provider directly overseeing the provision of those services are covered by this legislation.

Intro. 371-A would list specific factors to be considered in determining whether a facility looks like a licensed medical facility. Such factors are derived from the first committee hearing on Intro. 371 and are the features of PSCs which, as the testimony indicated, give the wrongful impression of a licensed medical facility or a facility with a licensed medical provider present. These factors would include (a) offering pregnancy testing and/or pregnancy diagnosis; (b) having staff or volunteers who wear medical attire or uniforms; (c) having one or more

11

examination tables; (d) having a private or semi-private room or area containing medical supplies and/or medical instruments; (e) having staff or volunteers collect health insurance information from clients; and (f) locating the facility on the same premises as a licensed medical facility or sharing facility space with a licensed medical provider. The presence of two or more of any of these factors would be prima facie evidence that the facility has the appearance of a licensed medical facility.

Under Intro. 371-A, a PSC would be required to make certain disclosures. Specifically, the PSC would be required to disclose whether it does or does not (1) have a licensed medical provider on staff who provides or directly supervises all of the services at the PSC; (2) provide or refer for prenatal care; (3) provide or refer for abortion; and (4) provide or refer for emergency contraception. The intent of Intro. 371-A is for each PSC to disclose whether or not it has a licensed medical provider who takes full responsibility for all health-related services provided by the PSC.

Centers will also have to inform clients that the DOHMH encourages women who are or who may be pregnant to consult with a licensed medical provider. All such disclosures are required to be made in English and Spanish: (i) on signs at the entrance of the PSC; (ii) in the PSC waiting area; (iii) and in any advertisements for PSC services. Additionally, PSC staff and/or volunteers would have to make such disclosures verbally upon a client's request for abortion, emergency contraception or prenatal care. This disclosure would be made in person or over the phone when a client requests or inquires whether the PSC provides one of these services.

Further, Intro. 371-A would require PSCs to keep all personal and health information obtained from clients or perspective clients confidential, unless a client provided written consent

12

to release such information or such disclosure were required by law. The confidentiality requirement, however, would not prohibit PSC staff from reporting child abuse and maltreatment as defined under State law.

Penalties for violating the disclosure or confidentiality requirements of Intro 371-A would be as follows: civil penalty of $200 to $1,000 for the first violation; $500 to $2,500 for each succeeding violation; for three or more violations within two years, after notice and a hearing, DCA is authorized to seal the Center for no more than five days. DCA would be permitted to allow entrance to a sealed PSC in order to remedy the violations.

Proposed Int. No. 371-A

By Council Members Lappin, the Speaker (Council Member Quinn), Arroyo, Ferreras, Mendez, Garodnick, Reyna, Foster, Brewer, Fidler, James, Koppell, Koslowitz, Lander, Palma, Rose, Van Bramer, Rodriguez, Chin, Dickens, Dromm, Mark-Viverito and Jackson.

## A LOCAL LAW

To amend the administrative code of the city of New York, in relation to pregnancy services centers.

Be it enacted by the Council as follows:

Section 1. Legislative findings and intent. It is the Council's intention that consumers in New York City have access to comprehensive information about and timely access to all types of reproductive health services including, but not limited to, accurate pregnancy diagnosis, prenatal care, emergency contraception and abortion.

Based on the evidence before it, the Council finds that some pregnancy services centers in New York City engage in deceptive practices, which include misleading consumers about the types of goods and services they provide on-site, misleading consumers about the types of goods and services for which they will provide referrals to third parties, and misleading consumers about the availability of licensed medical providers that provide or oversee services on-site. Such deceptive practices are used in advertisements for pregnancy services centers, which are misleading as to the services the centers do or do not provide.

The Council further finds that such deceptive practices can impede and/or delay consumers' access to reproductive health services. Some pregnancy services centers have engaged in conduct that wrongly leads clients to believe that they have received reproductive health care and counseling from a licensed medical provider. Prenatal care,

15

abortion and emergency contraception are all time sensitive services. Increasing the proportion of women receiving adequate and early prenatal care is a pronounced objective of the United States Department of Health and Human Services. The federal Centers for Disease Control and Prevention urges that comprehensive prenatal care begin as soon as a woman decides to become pregnant. Similar to prenatal care, delayed access to abortion and emergency contraception poses a threat to public health. Delay in accessing abortion or emergency contraception creates increased health risks and financial burdens, and may eliminate a women's ability to obtain these services altogether, severely limiting her reproductive health options.

The Council seeks both to stop pregnancy services centers that are currently engaging in deceptive practices in New York City from continuing to do so and to prevent pregnancy services centers from engaging in deceptive practices in New York City in the future. The Council fully embraces the right of pregnancy services centers to express their views about reproductive health services and seeks only to prevent and/or mitigate the effects of deceptive practices. Existing laws do not adequately protect consumers from the deceptive practices targeted by this legislation. Specifically, anti-fraud statutes have proven ineffective in prosecuting deceptive centers because the vulnerable population served by these centers faces potential threats or injury to their well-being by bringing forward complaints which often contain highly sensitive personal information, such as the circumstances surrounding a client's unplanned pregnancy. Clients have demonstrated a reluctance to come forward and disclose the events that occurred when they attempted to obtain such services.

The Council also finds that pregnancy services centers may collect sensitive personal and health information from consumers inquiring about or seeking services at such centers. However, most pregnancy services centers are not subject to the federal and state laws that limit the disclosure of such information by providers of medical care. If such information were to be improperly released, it could be significantly damaging to the consumers who utilize such centers. The release of such private information is particularly troublesome where the client is a victim of intimate partner violence and/or domestic abuse. As a result, the Council finds it necessary to create protections for the personal and health information provided by consumers inquiring about or seeking services at pregnancy services centers.

§ 2. Chapter 5 of Title 20 of the administrative code of the city of New York is amended by adding a new subchapter 17 to read as follows:

SUBCHAPTER 17
PREGNANCY SERVICES CENTERS

§ 20-815 Definitions.

§ 20-816 Required disclosures.

§ 20-817 Confidentiality of health and personal information.

§ 20-818 Penalties.

§ 20-819 Hearing authority.

§ 20-820 Civil cause of action.

§ 20-815 Definitions. For the purposes of this subchapter, the following terms shall have the following meanings: a. "Abortion" shall mean the termination of a

17

pregnancy for purposes other than producing a live birth, which includes but is not limited to a termination using pharmacological agents.

b. "Client" shall mean an individual who is inquiring about or seeking services at a pregnancy services center.

c. "Emergency contraception" shall mean one or more prescription drugs used separately or in combination, to prevent pregnancy, when administered to or self-administered by a patient, within a medically recommended amount of time after sexual intercourse, and dispensed for that purpose in accordance with professional standards of practice and determined by the United States food and drug administration to be safe.

d. "Health information" shall mean any oral or written information in any form or medium that relates to health insurance and/or the past, present or future physical or mental health or condition of a client.

e. "Licensed medical provider" shall mean a person licensed or otherwise authorized under the provisions of articles one hundred thirty-one, one hundred thirty-one-a, one hundred thirty-one-b, one hundred thirty-nine or one hundred forty of the education law of New York, to provide medical services.

f. "Personal information" shall mean any or all of the following: the name, address, phone number, email address, date of birth, social security number, driver's license number or non-driver photo identification card number of a client, a relative of a client or a sexual partner of a client. This term shall apply to all such data, notwithstanding the method by which such information is maintained.

g. "Pregnancy services center" shall mean a facility, including a mobile facility, the primary purpose of which is to provide services to women who are or may be

18

pregnant, that either: (1) offers obstetric ultrasounds, obstetric sonograms or prenatal care; or (2) has the appearance of a licensed medical facility. Among the factors that shall be considered in determining whether a facility has the appearance of a licensed medical facility are the following: the pregnancy services center (a) offers pregnancy testing and/or pregnancy diagnosis; (b) has staff or volunteers who wear medical attire or uniforms; (c) contains one or more examination tables; (d) contains a private or semi-private room or area containing medical supplies and/or medical instruments; (e) has staff or volunteers who collect health insurance information from clients; and (f) is located on the same premises as a licensed medical facility or provider or shares facility space with a licensed medical provider. It shall be prima facie evidence that a facility has the appearance of a licensed medical facility if it has two or more of the factors listed in subparagraphs (a) through (f) of paragraph (2) of this subdivision.

A pregnancy services center shall not include a facility that is licensed by the state of New York or the United States government to provide medical or pharmaceutical services or where a licensed medical provider is present to directly provide or directly supervise the provision of all services described in this subdivision that are provided at the facility.

h. "Premises" shall mean land and improvements or appurtenances or any part thereof.

i. "Prenatal care" shall mean services consisting of physical examination, pelvic examination or clinical laboratory services provided to a woman during pregnancy. Clinical laboratory services refers to the microbiological, serological, chemical, hematological, biophysical, cytological or pathological examination of materials derived

19

from the human body, for purposes of obtaining information, for the diagnosis, prevention, or treatment of disease or the assessment of health condition.

§ 20-816 Required disclosures. a. A pregnancy services center shall disclose to a client that the New York City Department of Health and Mental Hygiene encourages women who are or who may be pregnant to consult with a licensed medical provider.

b. A pregnancy services center shall disclose if it does or does not have a licensed medical provider on staff who provides or directly supervises the provision of all of the services at such pregnancy services center.

c. A pregnancy services center shall disclose if it does or does not provide or provide referrals for abortion.

d. A pregnancy services center shall disclose if it does or does not provide or provide referrals for emergency contraception.

e. A pregnancy services center shall disclose if it does or does not provide or provide referrals for prenatal care.

f. The disclosures required by this section must be provided:

(1) in writing, in English and Spanish in a size and style as determined in accordance with rules promulgated by the commissioner on (i) at least one sign conspicuously posted in the entrance of the pregnancy services center; (ii) at least one additional sign posted in any area where clients wait to receive services; and (iii) in any advertisement promoting the services of such pregnancy services center in clear and prominent letter type and in a size and style to be determined in accordance with rules promulgated by the commissioner; and

(2) orally, whether by in person or telephone communication, upon a client or prospective client request for any of the following services: (i) abortion; (ii) emergency contraception; or (iii) prenatal care.

§ 20-817 Confidentiality of health and personal information. a. All health information and personal information provided by a client in the course of inquiring about or seeking services at a pregnancy services center shall be treated as confidential and not disclosed to any other individual, company or organization unless such client, in writing, requests or consents to the release of such information, or disclosure is required by operation of law or court order.

b. Any consent for the release of health or personal information required pursuant to subdivision a of this section must:

(1) be in writing, dated and signed by the client;

(2) identify the nature of the information to be disclosed;

(3) identify the name and institutional affiliation of the person or class of persons to whom the information is to be disclosed;

(4) identify the organization or individual who is to make the disclosure;

(5) identify the client;

(6) contain an expiration date or an expiration event that relates to the client or the purpose of the use or disclosure.

c. Any client that consents to the release of health or personal information pursuant to subdivision b of this section must have a clear and complete understanding of the nature of such release and the content of such information.

21

d. Notwithstanding subdivisions a and b of this section, if any pregnancy services center employee or volunteer has reasonable cause to suspect that a client receiving services at a pregnancy services center is an abused or maltreated child, such employee or volunteer may report such abuse to the statewide central register of child abuse and maltreatment in accordance with section four-hundred thirteen or four-hundred fourteen of the social services law of New York, and to the administration for children's services, and/or the police department, and cooperate in the investigation related thereto to the extent permitted by applicable state and federal law. For the purposes of this subdivision, "abused child" and "maltreated child" shall be defined in accordance with section four-hundred twelve of the social services law of New York, or as a person under the age of eighteen whose parent or guardian legally responsible for such person's care inflicts serious physical injury upon such person, creates a substantial risk of serious physical injury, or commits an act of sexual abuse against such person. Reporting child abuse and maltreatment as defined in this subdivision to an individual or entity other than the statewide central registrar of child abuse and maltreatment, the administration for children's services or the police department shall be a violation of this section.

§ 20-818 Penalties. a. Any pregnancy services center that violates the provisions of sections 20-816 or 20-817 of this subchapter or any rules or regulations promulgated thereunder shall be liable for a civil penalty of not less than two hundred dollars nor more than one thousand dollars for the first violation and a civil penalty of not less than five hundred dollars nor more than two thousand-five hundred dollars for each succeeding violation.

b. (1) If any pregnancy services center is found to have violated the provisions of section 20-816 on three or more separate occasions within two years, then, in addition to imposing the penalties set forth in subdivision a of this section, the commissioner, after notice and a hearing, shall be authorized to order that the pregnancy services center be sealed for a period not to exceed five consecutive days, except that such premises may be entered with the permission of the commissioner solely for actions necessary to remedy past violations of section 20-816 or prevent future violations or to make the premises safe. For the purposes of this subdivision, any violations at a pregnancy services center shall not be included in determining the number of violations of any subsequently established pregnancy services center at that location unless the commissioner establishes that the subsequent operator of such pregnancy services center acquired the premises or pregnancy services center, in whole or in part, for the purpose of permitting the previous operator of the pregnancy services center who had been found guilty of violating section 20-816 of this subchapter to avoid the effect of such violations.

(2) Orders of the commissioner issued pursuant to paragraph one of this subdivision shall be posted at the premises that are the subject of the order(s).

(3) Ten days after the posting of an order issued pursuant to paragraph one of this subdivision, and upon the written directive of the commissioner, officers and employees of the department and officers of the New York city police department are authorized to act upon and enforce such orders.

(4) A closing directed by the department pursuant to paragraph one of this subdivision shall not constitute an act of possession, ownership or control by the city of the closed premises.

23

(5) Mutilation or removal of a posted order of the commissioner or his designee shall be punishable by a fine of not more than two hundred fifty dollars or by imprisonment not exceeding fifteen days, or both, provided such order contains therein a notice of such penalty. Any other intentional disobedience or resistance to any provision of the orders issued pursuant to paragraph one of this subdivision, including using or occupying or permitting any other person to use or occupy any premises ordered closed without the permission of the department as described in subdivision b shall, in addition to any other punishment prescribed by law, be punishable by a fine of not more than one thousand dollars, or by imprisonment not exceeding six months, or both.

c. For the purposes of this section, all violations committed on any one day by any one pregnancy services center shall constitute a single violation.

§ 20-819 Hearing authority. a. Notwithstanding any other provision of law, the department shall be authorized, upon due notice and hearing, to impose civil penalties for the violation of the provisions of this subchapter and any rules promulgated thereunder. The department shall have the power to render decisions and orders and to impose civil penalties not to exceed the amounts specified in section 20-818 of this subchapter for each such violation. All proceedings authorized pursuant to this section shall be conducted in accordance with rules promulgated by the commissioner. The penalties provided for in section 20-818 of this subchapter shall be in addition to any other remedies or penalties provided for the enforcement of such provisions under any other law including, but not limited to, civil or criminal actions or proceedings.

b. All proceedings under this subchapter shall be commenced by the service of a notice of violation returnable to the administrative tribunal of the department. Notice of

24

any third violation for engaging in a violation of section 20-816 shall state that premises may be ordered sealed after a finding of a third violation. The commissioner shall prescribe the form and wording of notices of violation. The notice of violation or copy thereof when filled in and served shall constitute notice of the violation charged, and, if sworn to or affirmed, shall be prima facie evidence of the facts contained therein.

§ 20-820 Civil cause of action. Any person claiming to be injured by the failure of a pregnancy services center to comply with section 20-817 shall have a cause of action against such pregnancy services center in any court of competent jurisdiction for any or all of the following remedies: compensatory and punitive damages; injunctive and declaratory relief; attorney's fees and costs; and such other relief as a court deems appropriate.

§ 3. Effect of invalidity; severability. If any section, subsection, sentence, clause, phrase or other portion of this local law is, for any reason, declared unconstitutional or invalid, in whole or in part, by any court of competent jurisdiction, such portion shall be deemed severable, and such unconstitutionality or invalidity shall not affect the validity of the remaining portions of this local law, which remaining portions shall continue in full force and effect.

§ 4. This local law shall take effect one hundred twenty days after its enactment into law, provided that the commissioner may promulgate any rules necessary for implementing and carrying out the provisions of this local law prior to its effective date.

AMS/RC
LS # 7922-8
2/22/11

26