UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
THE EVERGREEN ASSOCIATION,          :          11 Civ. 2055 (WHP)
INC., d/b/a EXPECTANT MOTHER
CARE PREGNANCY CENTERS-EMC          :
FRONTLINE PREGNANCY CENTERS,
et ano.,                            :          MEMORANDUM & ORDER

                 Plaintiffs,        :

             -against-              :

THE CITY OF NEW YORK,               :

                 Defendant.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
PREGNANCY CARE CENTER               :          11 Civ. 2342 (WHP)
OF NEW YORK, et al.,
                                    :
                 Plaintiffs,        :

             -against-              :

THE CITY OF NEW YORK, et al.,       :

                 Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:                           │
│ DATE FILED:   7/13/11            │
└─────────────────────────────────┘
```

WILLIAM H. PAULEY III, District Judge:

            Plaintiffs Evergreen Life Association, Inc. ("Evergreen"), Life Center of New

York, Inc. ("Life Center"), Pregnancy Care Center of New York ("Pregnancy Care"), Boro

Pregnancy Counseling Center ("Boro"), and Good Counsel Homes ("Good Counsel") bring these

actions against Defendants The City of New York (the "City"), Mayor Michael Bloomberg, and

New York City Department of Consumer Affairs Commissioner Jonathan Mintz (the

"Commissioner"), alleging that New York City Local Law No. 17[1] ("Local Law 17" or the

_____

[1] New York, N.Y., Administrative Code, ch. 5, title 20 (2011).

"Ordinance") infringes their free speech rights under the United States and New York

constitutions. Plaintiffs move for a preliminary injunction enjoining Local Law 17 from taking

effect on July 14, 2011 until this action is resolved. For the following reasons, Plaintiffs' motion

is granted.

BACKGROUND

I.  Local Law 17

Local Law 17 requires facilities defined as "pregnancy services centers" to make

certain mandatory disclosures concerning their services. (Declaration of Nicholas Ciappetta

dated May 18, 2011 ("Ciappetta Decl.") Ex. F: New York City Local Law No. 17.)  A

"pregnancy services center" is defined as any facility whose "primary purpose . . . is to provide

services to women who are or may be pregnant" and "that either[] (1) offers obstetric

ultrasounds, obstetric sonograms or prenatal care[,] or (2) has the appearance of a licensed

medical facility." (Local Law 17 § 20-815(g).) The following factors are "among the factors

that shall be considered in determining whether a facility has the appearance of a licensed

medical facility":

> [whether the facility] (a) offers pregnancy testing and/or pregnancy
> diagnosis; (b) has staff or volunteers who wear medical attire or
> uniforms; (c) contains one or more examination tables; (d) contains
> a private or semi-private room or area containing medical supplies
> and/or medical instruments; (e) has staff or volunteers who collect
> health insurance information from clients; and (f) is located on the
> same premises as a licensed medical facility or provider or shares
> space with a licensed medical provider.

(Local Law 17 § 20-815(g).) Local Law 17 states that "it shall be prima facie evidence that a

facility has the appearance of a licensed medical facility if it has two or more of the[se] factors

. . . ." (Local Law 17 § 20-815(g).)

2

The Ordinance exempts facilities that (1) are licensed by New York State or the United States to "provide medical or pharmaceutical services," or (2) have a "licensed medical provider . . . present to directly provide or directly supervise the provision of" any of the services listed above.  (Local Law 17 § 20-815(g).)

Any facility qualifying as a pregnancy services center must make the following disclosures:

(1) "that the New York City Department of Health and Mental Hygiene encourages women who are or who may be pregnant to consult with a licensed medical provider";

(2) whether it has "a licensed medical provider on staff who provides or directly supervises the provision of all of the services" at the facility; and

(3) whether it provides referrals for abortion, emergency contraception, and prenatal care.

(Local Law 17 § 20-816(a)-(e).)  The disclosures must be made in the following manner:

(1) in writing, in English and Spanish in a size and style determined in accordance with rules promulgated by the [C]ommissioner on (i) at least one sign conspicuously posted in the entrance of the pregnancy services center; (ii) at least one additional sign posted in any area where clients wait to receive services; and (iii) in any advertisement promoting the services of [the] pregnancy services center in clear and prominent letter type and in a size and style to be determined in accordance with rules promulgated by the commissioner; and

(2) orally, whether by in person or telephone communication, upon a client or prospective client request for any of the following services: (i) abortion; (ii) emergency contraception; or (iii) prenatal care.

(Local Law 17 § 20-816(f).)

Local Law 17 imposes fines of between $200 and $1000 for the first violation, and between $500 and $2000 for each additional violation.  (Local Law 17 § 20-818(a).)  It also

authorizes the Commissioner to "seal" any facility for five days that has been found (after notice and a hearing) to have violated the Ordinance's provisions on three or more separate occasions within two years.  (Local Law 17 § 20-818(b).)

The New York City Council (the "City Council") enacted Local Law 17 after finding that "some pregnancy services centers in New York City engage in deceptive practices, which include misleading consumers about [(i)] the types of goods and services they provide on-site," (ii) "the types of goods and services for which they will provide referrals to third parties," and (iii) "the availability of licensed medical providers that provide or oversee services on-site." (Local Law 17 § 1.)  The City Council found that these deceptive practices "can impede and/or delay consumers' access to reproductive health services" and "wrongly lead [consumers] to believe that they have received reproductive health care and counseling from a licensed medical provider."  (Local Law 17 § 1.)  The City Council further found that "delayed access to abortion and emergency contraception . . . increase[s] health risks and financial burdens[] and may eliminate a wom[a]n's ability to obtain these services altogether, severely limiting her reproductive health options."  (Local Law 17 § 1.)  In addition, the City Council determined that "[e]xisting laws do not adequately protect consumers from the deceptive practices targeted by [Local Law 17] . . . and anti-fraud statutes have proven ineffective in prosecuting deceptive centers" because pregnant women are reluctant to report abuses due to privacy concerns.  (Local Law 17 § 1.)

II.  The Plaintiffs

Evergreen and Life Center operate facilities in New York City that offer various pregnancy-related services, including pregnancy testing, ultrasounds, and counseling.

(Complaint ¶¶ 8-12, The Evergreen Ass'n, Inc. v. City of N.Y., 11 Civ. 2055 (Mar. 24, 2011) ("Evergreen Compl."), ECF. No. 1.)

Pregnancy Care, Boro, and Good Counsel also operate facilities in New York City that offer various pregnancy-related services but do not perform ultrasounds or physical examinations. (Complaint ¶ 70, Pregnancy Care Ctr. v. City of N.Y., 11 Civ. 2342 (Apr. 5, 2011) ("Pregnancy Care Compl."), ECF No. 1.) Their services include counseling, parenting and maternity education, and referrals to adoption and domestic violence agencies and to licensed medical facilities. (Pregnancy Care Compl. ¶¶ 30, 48, 63-64.) Pregnancy Care and Boro also offer free, self-administered and self-interpreted pregnancy tests and provide non-financial assistance in the form of diapers, formula, clothing, and toys. (Pregnancy Care Compl. ¶¶ 31-36, 51-55.) Good Counsel runs residential facilities for homeless and abused pregnant women and provides counseling and education services on-site. (Pregnancy Care Compl. ¶¶ 59-63.) To facilitate appointments with outside medical providers, Good Counsel collects health insurance information from its clients. (Pregnancy Care Compl. ¶ 215.)

The services provided by Plaintiffs are free, with the exception of Good Counsel, which requires certain contributions from women living in its facilities.[2] (Evergreen Compl. ¶¶ 9-11; Pregnancy Care Compl. ¶¶ 20-21.) For moral and religious reasons, none of the Plaintiffs offer or provide referrals for abortions or emergency contraception. (Evergreen Compl. ¶ 13; Pregnancy Care Compl. ¶¶ 72-73, 75.) Plaintiffs provide pregnancy-related services based on the express belief that such assistance will prevent abortions by allowing women to carry their pregnancies to full term. (See, e.g., Declaration of Christopher Slattery dated Apr. 27, 2011 ¶¶ 5-8; Pregnancy Care Compl. ¶¶ 269-70.)

---

[2] Good Counsel asks women on public assistance to pass on their rent subsidy to Good Counsel, and women who are employed to contribute 10% of their income to the agency. (Pregnancy Care Compl. ¶ 21.)

5

## DISCUSSION

I.  Preliminary Injunction Standard

A party seeking to "stay government action taken in the public interest pursuant to a statutory or regulatory scheme" must establish "(1) a likelihood of success on the merits and (2) irreparable harm in the absence of an injunction." Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev., --- F.3d ----, 2011 WL 2623447, at *8 (2d Cir. July 6, 2011) (quoting Alleyne v. N.Y. State Educ. Dep't, 516 F.3d 96, 101 (2d Cir. 2008)); accord Lynch v. City of N.Y., 589 F.3d 94, 98 (2d Cir. 2009).

II.  Analysis

a.  Irreparable Harm

While the Supreme Court has stated that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," Elrod v. Burns, 427 U.S. 347, 374 (1976), the Court of Appeals has "not consistently presumed irreparable harm in cases involving allegations of the abridgement of First Amendment rights." Bronx Household of Faith v. Bd. of Educ. of City of N.Y., 331 F.3d 342, 349 (2d Cir. 2003). Rather, irreparable harm may be presumed only "[w]here a plaintiff alleges injury from a rule or regulation that directly limits speech . . . ." Bronx Household, 331 F.3d at 350. In contrast, "where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, . . . the plaintiff must demonstrate that the injunction will prevent the feared deprivation of free speech rights." Bronx Household, 331 F.3d at 350; accord Bray v. City of N.Y., 346 F. Supp. 2d 480, 487 (S.D.N.Y. 2004).

Here, Plaintiffs have demonstrated that Local Law 17 will compel them to speak

6

certain messages or face significant fines and/or closure of their facilities.  See Bronx Household,
331 F.3d at 350 ("[A] party must articulate a 'specific present objective harm or a threat of
specific future harm.'" (quoting Laird v. Tatum, 408 U.S. 1, 14 (1972)).  This is unquestionably
a direct limitation on speech.  See O'Brien v. Mayor and City Council of Balt., --- F. Supp. 2d ---
-, 2011 WL 572324, at *5 (D. Md. Jan. 28, 2011) ("[R]equiring the placement of a 'disclaimer'
sign in [a facility's] waiting room is, on its face, a form of compelled speech.").  Accordingly,
this Court presumes a threat of irreparable harm to Plaintiffs' First Amendment rights.

> b.  Likelihood of Success on the Merits

> > i.  Appropriate Level of Scrutiny

The parties disagree over the level of scrutiny to be applied to Local Law 17.
According to Plaintiffs, Local Law 17 should be subject to strict scrutiny because it compels
them to speak government-crafted messages and is both content- and viewpoint-based.  In
contrast, Defendants argue that a lower standard of scrutiny applies because Local Law 17
governs commercial speech and requires purely factual disclosures as opposed to protected
expression.

"At the heart of the First Amendment lies the principle that each person should
decide for himself or herself the ideas and beliefs deserving of expression, consideration, and
adherence. . . .  Government action that stifles speech on account of its message, or that requires
the utterance of a particular message favored by the Government, contravenes this essential
[principle]."  Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 641 (1994).  "Laws of this sort
pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but
to suppress unpopular ideas or information or manipulate the public debate through coercion
rather than persuasion."  Turner Broad., 512 U.S. at 641; see also Simon & Schuster, Inc. v.

7

Members of N.Y.S. Crime Victims Bd., 502 U.S. 105, 116 (1991) ("The constitutional right of free expression is intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us[,] in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." (quotations omitted)).  This is particularly true where, as here, Plaintiffs' speech on reproductive rights concerns an issue prevalent in the public discourse.  See Snyder v. Phelps, 131 S. Ct. 1207, 1215 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (quoting Connick v. Myers, 461 U.S. 138, 145 (1983)).

        In recognition of these principles, "[l]aws that compel speakers to utter or distribute speech bearing a particular message are subject to [strict] scrutiny." Turner Broad., 512 U.S. at 642; see also Alliance, 2011 WL 2623447, at *12 ("Where . . . the government seeks to affirmatively require government-preferred speech, its efforts raise serious First Amendment concerns."); Amidon v. Student Ass'n of State Univ. of N.Y. at Albany, 508 F.3d 94, 99 (2d Cir. 2007) ("The First Amendment's guarantee of freedom of speech includes both the right to speak freely and the right to refrain from speaking at all.").  To satisfy strict scrutiny, a law must be "narrowly tailored to serve a compelling governmental interest." Amidon, 508 F.3d at 106; accord Turner Broad., 512 U.S. at 653.  A statute is not narrowly tailored if "a less restrictive alternative would serve the Government's purpose." United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813 (2000).  Moreover, while the mere intonation of the strict scrutiny standard will not render a law invalid, see Grutter v. Bollinger, 539 U.S. 306, 326 (2003), strict scrutiny is "the most demanding test known to constitutional law." City of Boerne v. Flores, 521 U.S. 507, 534 (1997).

8

The First Amendment accords less protection, however, to commercial speech.

See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 563

(1980). Commercial speech is "subject[ed] to 'modes of regulation that might be impermissible

in the realm of noncommercial expression'" due to "'its subordinate position in the scale of First

Amendment values.'" Fla. Bar v. Went For It, Inc., 515 U.S. 618, 623 (1995) (quoting Bd. of

Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 477 (1989)). As the Supreme Court

observed,

> [t]wo features of commercial speech permit regulation of its
> content. First, commercial speakers have extensive knowledge of
> both the market and their products. Thus, they are well situated to
> evaluate the accuracy of their messages and the lawfulness of the
> underlying activity. Bates v. State Bar of Ariz., 433 U.S. 350, 381
> . . . (1977). In addition, commercial speech, the offspring of
> economic self-interest, is a hardy breed of expression that is not
> "particularly  susceptible  to  being  crushed  by  overbroad
> regulation." [Bates, 433 U.S. at 381.]

Central Hudson, 447 U.S. at 564 n.6 (1980). As a result, laws governing commercial speech are

generally subject to only intermediate scrutiny.

The Supreme Court has articulated two basic definitions of commercial speech.

First, speech is commercial when it "'does no more than propose a commercial transaction.'"

Conn. Bar Ass'n v. United States, 620 F.3d 81, 93 (2d Cir. 2010) (quoting Bolger v. Youngs

Drug Prods. Corp., 463 U.S. 60, 66 (1983)). Second, "commercial speech [has been defined] as

'expression related solely to the economic interests of the speaker and its audience.'" Conn. Bar

Ass'n, 620 F.2d at 94 (quoting Central Hudson, 447 U.S. at 561).

Defendants advance two basic arguments why Plaintiffs engage in commercial

speech: (1) they advertise goods and services—e.g., diapers, clothing, counseling, pregnancy

testing, and ultrasounds—that have commercial value; and (2) Plaintiffs receive something of

9

value in return for those goods and services, namely, "the opportunity to advocate against abortion and either delay or prevent the decision to terminate a pregnancy." (Defs. Opp'n at 7.)[3] Neither argument is persuasive.

First, an organization does not propose a "commercial transaction" simply by offering a good or service that has economic value. See Bolger, 463 U.S. at 67 ("[T]he reference to a specific product does not by itself render the pamphlets [circulated by Plaintiff] commercial speech."). Rather, a commercial transaction is an exchange undertaken for some commercial purpose:

> "Commercial" means "[o]f or relating to commerce." The American Heritage Dictionary of the English Language 371 (4th ed. 2000). Dictionary definitions of "commerce," in turn, speak in terms of "[t]he buying and selling of goods," id.; the "[e]xchange between men of the products of nature or art; buying and selling together; trading; exchange of merchandise," The Oxford English Dictionary, 552 (1989); and "the exchange or buying and selling of commodities on a large scale involving transportation from place to place," Merriam-Webster's Collegiate Dictionary, 230 (10th ed. 2000) (second definition).

Goldberg v. Cablevision Sys. Corp., 261 F.3d 318, 327 (2d Cir. 2001). If speech becomes commercial speech merely through the offer of a valuable good or service, then "any house of worship offering their congregants sacramental wine, communion wafers, prayer beads, or other objects with commercial value, would find their accompanying speech subject to diminished constitutional protection." O'Brien, 2011 WL 572324, at *6. Likewise, a domestic violence organization advertising shelter to an abuse victim would find its First Amendment rights curtailed, since the provision of housing confers an economic benefit on the recipient. But plainly speech by a church or domestic violence organization is not undertaken for a commercial

---

[3] Defendants also incorrectly rely on the "government speech" doctrine. That doctrine applies only to speech by the Government, not a private entity. See Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 557-61 (2005).

purpose. For the same reasons, the offer of free services such as pregnancy tests in furtherance

of a religious belief does not propose a commercial transaction. See O'Brien, 2011 WL 572324,

at *6; Tepeyac v. Montgomery Cty., --- F. Supp. 2d ----, 2011 WL 915348, at *4-5 (D. Md. Mar.

15, 2011). Adoption of Defendants' argument would represent a breathtaking expansion of the

commercial speech doctrine.[4]

      Nor do Plaintiffs offer pregnancy-related services in furtherance of their economic

interests. Plaintiffs' missions—and by extension their charitable work—are grounded in their

opposition to abortion and emergency contraception. See Tepeyac, 2011 WL 915348, at *5

(finding that similar facilities offering pregnancy-related services were motivated by "social

concerns" rather than economic interest). While it may be true that Plaintiffs increase their

"fundraising prowess" by attracting clients, (Defs. Opp'n at 6 n.3), they do not advertise "solely"

for that purpose. Even if they did, strict scrutiny would still apply, since the Supreme Court has

never viewed "charitable solicitation . . . as a variety of purely commercial speech."[5] Vill. of

Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 632 (1980); see also Riley, 487 U.S. at

795-96 (applying strict scrutiny to speech aimed at soliciting charitable donations).[6]

---

[4] Even if Plaintiffs' advertising could somehow be characterized as having a commercial quality, speech does not "retain[] its commercial character when it is inextricably intertwined with otherwise fully protected speech." Riley v. Nat'l Federation of the Blind of N.C., Inc., 487 U.S. 781, 796 (1988). In this case, Plaintiffs' advertising is integrally intertwined with their beliefs on abortion and contraception.

[5] Of course, if Plaintiffs are referring women to pro-life doctors in exchange for "charitable" contributions, the analysis could change. But no such evidence has been presented on these motions.

[6] Given the New York Civil Liberties Union's ("NYCLU") usual concern for First Amendment rights, its amicus brief supporting Defendants' expansive view of the commercial speech doctrine is puzzling. (See Br. of Amicus Curiae NYCLU at 13-14 ("[Plaintiffs] are promoting and providing free but valuable health care services to pregnant consumers choosing among health care providers in a commercial marketplace. They have entered that marketplace, and, in

11

Defendants' second argument—that Plaintiffs engage in commercial speech because they are provided an audience to whom they can espouse their beliefs—is particularly offensive to free speech principles. While Defendants apparently regard an assembly of people as an economic commodity, this Court does not. See Snyder, 131 S. Ct. at 1217-18 (discussing the intersection between public assembly and principles of free speech). Under such a view, flyers for political rallies, religious literature promoting church attendance, or similar forms of expression would constitute commercial speech merely because they assemble listeners for the speaker. Accepting that proposition would permit the Government to inject its own message into virtually all speech designed to advocate a message to more than a single individual and thereby eviscerate the First Amendment's protections. See Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984) ("An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed."). This Court will not upend established free speech protections in service of Defendants' overly broad definition of commercial speech.

The fact that Local Law 17 mandates only factual disclosures does not save it from strict scrutiny. The lower scrutiny accorded factual disclosures applies only to commercial speech. See Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston, 515 U.S. 557, 573-74 (1995) ("[O]utside th[e] context [of commercial speech, the State] may not compel affirmance of a belief with which the speaker disagrees. . . . This general rule . . . applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid . . . ."); see also Tepeyac, 2011 WL 915348, at *5 ("[T]he Supreme

doing so, can be required by [Local Law 17's] disclosure obligations to make clear to consumers who they are and what they do.").)

12

Court has said that the deferential approach to factual disclosure and disclaimer requirements . . .
is largely limited to the realm of commercial speech.").

Finally, cases permitting the regulation of professional speech do not validate
Local Law 17's disclosure provisions. Relying primarily on Planned Parenthood of Southeastern
Pa. v. Casey, 505 U.S. 833, 884 (1992), Plaintiffs argue that a state's power to require a doctor to
provide certain information concerning the decision to have an abortion also permits the state to
regulate speech by unlicensed facilities offering reproductive-related services. But that argument
fails for two reasons. First, as Defendants admit, Plaintiffs do not engage in the practice of
medicine. (See Defs. Br. at 1 (agreeing that a medical license is not required to perform an
obstetric ultrasound).) If they did, they would be subject to penalties for practicing medicine
without a license. See N.Y. Educ. Law § 6512. While not directly bearing on the issue of
whether Plaintiffs' speech is commercial, Defendants' concession reveals an astonishing lacuna
in the oversight of ultrasound examinations: no license or accreditation of ultrasound technicians
is required by the City or New York State.

Second, as a corollary, Plaintiffs do not engage in professional speech. A
professional has been characterized as "[o]ne who takes the affairs of a client personally in hand
and purports to exercise judgment on behalf of the client in the light of the client's individual
needs and circumstances." Lowe v. Sec. & Exch. Comm'n, 472 U.S. 181, 232 (1985) (White, J.,
concurring); see also Tepeyac, 2011 WL 915348, at *8 ("[S]peech may be labeled 'professional
speech' when it is given in the context of a quasi-fiduciary—or actual fiduciary—relationship,
wherein the speech is tailored to the listener and made on a person-to-person basis."). While
Plaintiffs meet with clients individually, there is no indication that they employ any specialized
expertise or professional judgment in service of their clients' individual needs and

13

circumstances. See, e.g., Fla. Bar v. Went For It, Inc., 515 U.S. 618, 625-26 (1995) (upholding

regulations on the legal profession); Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd.

of Psychology, 228 F.3d 1043, 1054 (9th Cir. 2000) (upholding regulations on mental health

professionals). Ironically, Defendants' argument that Plaintiffs engage in professional speech

might be more persuasive if the City licensed ultrasound technicians. But because no such

license is required, this Court cannot evaluate Local Law 17 through the lens of lowered scrutiny

accorded to professional speech. Accordingly, this Court will apply strict scrutiny in evaluating

Local Law 17.

### ii.  Compelling Interest

Local Law 17 was enacted to combat deceptive practices that impede access to

reproductive health services or mislead women into believing they have received care from a

licensed medical provider. Specifically, the record before the City Council included, inter alia,

anecdotes about pregnancy service centers that (i) falsely told a woman she needed multiple

ultrasounds before an abortion could be performed (Ciappetta Decl. ¶ 37); (ii) misrepresented

that abortions are available through the nine month of pregnancy (Ciappetta Decl. ¶ 35); and (iii)

redirected a woman to its facility using an employee posing as a Planned Parenthood staff

member (Ciappetta Decl. ¶ 24).

Rather than disputing whether the City has a compelling interest in preventing

deceptive practices generally, Plaintiffs challenge the sufficiency of the evidence, contending

that it consists almost exclusively of second-hand accounts from pro-choice organizations and

individuals. In substance, Plaintiffs intimate that the evidence presented to the City Council was

contrived. At this stage, this Court need not address the adequacy of the record before the City

Council, for, as discussed below, Local Law 17 is not narrowly tailored. However, this Court

14

recognizes that the prevention of deception related to reproductive health care is of paramount importance. Lack of transparency and delay in prenatal care can gravely impact a woman's health. (See Ciappetta Decl. Ex. G: Tr. of Minutes of the Comm. on Women's Issues dated Nov. 16, 2010 at 15-18.) Unlicensed ultrasound technicians operating in pseudo-medical settings can spawn significant harms to pregnant, at-risk women who believe they are receiving medical care. Plaintiffs' categorical denial of the existence of any such deception—and refusal to acknowledge the potential misleading nature of certain conduct—feigns ignorance of the obvious.

### iii. Narrowly Tailored

Plaintiffs argue that Local Law 17 is not narrowly tailored because there are less restrictive alternatives for preventing deceptive practices that impede access to reproductive care. This Court agrees.

The manner in which Local Law 17's disclosures must be made provide a logical starting point. Among other things, they require Plaintiffs to include in any advertising English and Spanish versions of the City's recommendation that pregnant women consult a licensed medical provider. To be clear, there is nothing objectionable about this message. However, the requirement is over-inclusive because Plaintiffs' advertising need not be deceptive for the Local Law 17 to apply; any advertisement offering a facility's services falls within Local Law 17's scope. See Green Party of Conn. v. Garfield, 616 F.3d 189, 209 (2d Cir. 2010) ("In order to narrowly tailor a law to address a problem, . . . the government must avoid infringing on speech that does not pose the danger that has prompted regulation." (quotations omitted)). In fact, Local Law 17's over-expansiveness is evident from its very language. While Section 1 states that only "some pregnancy service centers in New York City engage in deceptive practices," the Ordinance applies to all such facilities. (Local Law 17 § 1.) By reaching innocent speech, Local

15

Law 17 runs afoul of the principle that a law regulating speech must "target[] and eliminate[] . . . [only] the exact source of the 'evil' it seeks to remedy." Frisby v. Schultz, 487 U.S. 474, 485 (1988).

        Local Law 17's advertising provisions will burden Plaintiffs in at least two ways. First, they will increase Plaintiffs' advertising costs by forcing them to purchase more print space or airtime, which in New York's expensive media market could foreclose certain forms of advertising altogether. Second, they will alter the tenor of Plaintiffs' advertising by drowning their intended message in the City's preferred admonitions. See Wooley v. Maynard, 430 U.S. 705, 714 (1977) ("A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts."). Likewise, the requirement that certain disclosures be made orally on any request for an abortion, emergency contraception, or prenatal care will significantly alter the manner in which Plaintiffs approach these topics with their audience. See Alliance, 2011 WL 2623447, at *14 ("[The law] offends [the right to communicate freely on matters of public concern], mandating that Plaintiffs affirmatively espouse the government's position on a contested public issue where the differences are both real and substantive.").

        Defendants concede that a sign in English and Spanish outside each facility stating that there are no medical personnel on-site would notify women that medical care was unavailable at the facility. (See Hr'g Tr. dated June 15, 2011 ("Tr.") at 32.) Moreover, the City controls the right-of-way and could erect a sign on public property outside each pregnancy service center encouraging pregnant women to consult with a licensed medical provider. Such alternatives would convey the City's message and be less burdensome on Plaintiffs' speech.[7]

---

[7] The City is also perfectly capable of conveying its message through a public service advertising campaign.

16

See Tepeyac, 2011 WL 915348, at* 13 ("[S]everal options less restrictive than compelled speech could be used to encourage pregnant women to see a licensed medical professional.  For example, Defendants could post notices encouraging women to see a doctor in [government] facilities or launch a public awareness campaign."); see also Riley, 487 U.S. at 793 (finding that the state law impermissibly placed the burden on private entities to "rebut the presumption" that their conduct was unreasonable).

Further, while the City Council maintains that anti-fraud statutes have been ineffective in prosecuting deceptive facilities, Defendants could not confirm that a single prosecution had ever been initiated.  (See Hr'g Tr. dated June 15, 2011 at 31 ("THE COURT: Has the city ever attempted to prosecute any of these facilities under the anti-fraud laws?  MS. BINDER:  I don't believe at the district attorney level there was ever an attempt to prosecute this.  There may have been something at a state level but I don't know if it resulted in a prosecution.  There might have been an investigation by the state Attorney General.  But there has not been anything at the city level.").)  Such prosecutions offer a less restrictive alternative to imposing speech obligations on private speakers. See Riley, 487 U.S. at 800-01 ("[T]he State may vigorously enforce its antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements.  These more narrowly tailored rules are in keeping with the First Amendment directive that government not dictate the content of speech absent compelling necessity, and then, only by means precisely tailored."); O'Brien, 2011 WL 572324, at *10 ("In lieu of the disclaimer mandate of the Ordinance, Defendants could use or modify existing regulations governing fraudulent advertising to combat deceptive advertising practices by limited-service pregnancy centers.").

As a final matter, this Court notes that the City could impose licensing

17

requirements on ultrasound technicians (or lobby the New York State legislature to impose state licensing requirements). Of all of the services provided by Plaintiffs, ultrasounds are the most potentially deceptive: a woman visiting a facility that performs and/or interprets ultrasounds could reasonably form the impression that she has received medical treatment. However, by permitting ultrasound examinations to be performed only by licensed professionals, the City could regulate the manner in which those examinations are conducted and curb any manipulative use. Such licensing schemes are not unprecedented; two states already require ultrasounds to be performed by a licensed professional. See N.M. Stat. Anno. §§ 61-14E-1 to 14E-12; Or. Rev. Stat. §§ 688.405, 688.415.

Accordingly, this Court finds that Plaintiffs have demonstrated a likelihood of success of establishing that Local Law 17's disclosure requirements fail strict scrutiny.

c. Vagueness

Having made this finding, this Court must now determine whether to enjoin Local Law 17 in its entirety or sever its confidentiality provisions and allow them to take effect.[8] There is a presumption against invalidating an entire statute where only a portion of the statute is challenged on constitutional grounds. See Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock, 93 F.3d 68, 72 (2d Cir. 1996) ("[A] court should refrain from invalidating an entire statute when only portions of it are objectionable." (quotations and citations omitted)). However, while Plaintiffs do not challenge the confidentiality provisions, those provisions apply only to facilities meeting the definition of a "pregnancy services center." Plaintiffs challenge that definition as unconstitutionally vague.

---

[8] Those provisions prohibit pregnancy service centers from disclosing any health or personal information provided by a client to a third party without the client's consent. (Local Law 17 § 20-817(a).).

> "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000). Thus, all vagueness challenges—whether facial or as-applied—require us to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement.

Farrell v. Burke, 449 F.3d 470, 485 (2d Cir. 2006). As to arbitrary enforcement, the vagueness doctrine is intended to prevent the risk that enforcement decisions are made on an "'ad hoc' basis . . . reflect[ing] [an] official['s] subjective biases." Fox Television Stations, Inc. v. Fed. Commc'n Comm'n, 613 F.3d 317, 328 (2d Cir. 2010); see also City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 763 (1988) ("[A] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official.").

Local Law 17 defines a "pregnancy services center" as any facility whose primary purpose is to provide services to pregnant women and, inter alia, has the "appearance of a licensed medical facility." The Ordinance then lists specific nonexclusive factors for determining whether a facility has such an "appearance." Plaintiffs argue that this definition is impermissibly vague because (1) an ordinary person of reasonable intelligence cannot comprehend Local Law 17's enumerated factors, and (2) it vests unbridled discretion in the Commissioner to determine if a facility meets that definition.[9] This Court finds that Plaintiffs have demonstrated a likelihood of success on their second argument.

---

[9] This Court construes Plaintiffs' arbitrary enforcement argument as a facial challenge to Local Law 17. See Kolender v. Lawson, 461 U.S. 352, 358 (1983).

19

Local Law 17's fundamental flaw is that its enumerated factors are only "among" those to be considered by the Commissioner in determining whether a facility has the appearance of a licensed medical center. This formulation permits the Commissioner to classify a facility as a "pregnancy services center" based solely on unspecified criteria. Cf. Amidon, 508 F.3d at 104 ("[B]ecause the criteria are nonexclusive, there is a disconcerting risk that the [decision maker] could camouflage its discriminatory use of the [provision] through post-hoc reliance on unspecified criteria."). "[W]hile perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," Fox, 613 F.3d at 328 (quotations omitted), Local Law 17 fails to impose sufficient restraints on the Commissioner's discretion. The Ordinance could make the enumerated factors exclusive, require that a facility meet at least one, or include additional factors or guidance for determining whether a facility has the appearance of a medical facility. Any of these options could ameliorate discriminatory enforcement concerns.

This conclusion is not contrary to the Court of Appeals' decision in United States v. Schneiderman, 968 F.2d 1564 (2d Cir. 1992), on which Defendants rely. There, in rejecting the defendant's argument that a criminal statute prohibiting the sale of drug paraphernalia was unconstitutionally vague, the Court of Appeals found that the statute "strive[d] to channel enforcement activities" by offering "15 examples of targeted paraphernalia" and listing an additional "eight factors to consider among 'all other logically relevant factors' in determining whether a defendant had the requisite scienter to violate the statute." Schneiderman, 968 F.2d at 1568. The Court of Appeals found that those "guidelines tend[ed] to minimize the likelihood of arbitrary enforcement by providing objective criteria against which to measure possible violations of the law." In contrast, Local Law 17 offers far fewer enumerated factors and permits the Commissioner to classify a facility as a pregnancy services center without reference to any

20

one of them. In view of the fact that Local Law 17 relates to the provision of emergency contraception and abortion—among the most controversial issues in our public discourse—the risk of discriminatory enforcement is high. Accordingly, Plaintiffs have demonstrated a likelihood of success on the merits, and Local Law 17 is preliminarily enjoined in its entirety until this action is resolved.

Because Plaintiffs have demonstrated irreparable harm and a likelihood of success on the questions of whether Local Law 17 is narrowly tailored to prevent deceptive practices and is unconstitutionally vague, this Court need not address their remaining arguments regarding the New York State Constitution and New York Municipal Home Rule Law § 20(4).

## CONCLUSION

For the foregoing reasons, the motion by Plaintiffs Evergreen Life Association, Inc., Life Center of New York, Inc., Pregnancy Care Center of New York, Boro Pregnancy Counseling Center, and Good Counsel Homes to preliminarily enjoin Local Law 17 from taking effect on July 14, 2011 is granted. The Clerk of the Court is directed to terminate the motions pending at Docket No. 22 in 11 Civ. 2055, and Docket No. 12 in 11 Civ. 2342.

Dated: July 13, 2011
      New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*All Counsel of Record*

22